**SCHLAM STONE & DOLAN LLP**
26 Broadway, 19th Floor
New York, NY 10004
Telephone: (212) 433-5400
Jeffrey M. Eilender, Esq.
John M. Lundin, Esq.
Joshua Wurtzel, Esq.
Seth D. Allen, Esq.

*Attorneys for Plaintiffs Marco Polo Capital*
*Markets LLC, Debtor, and Marco Polo Network Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MARCO POLO CAPITAL MARKETS LLC,<br><br>          *Debtor.* | Chapter 11<br><br>Case No.: 12-14870 (SCC) |
| MARCO POLO CAPITAL MARKETS LLC,<br>Debtor, and MARCO POLO NETWORK INC.,<br><br>         *Plaintiffs,*<br><br>    -*against*-<br><br>ATG AMERICAS TRADING GROUP S.A.<br>(formerly known as MARCO POLO LATIN<br>AMERICA S.A.), MARTIN FERNANDO<br>COHEN, ARTHUR PINHEIRO MACHADO,<br>VICTRIX PARTNERS S.A., POSTALIS –<br>INSTITUTO DE SEGURIDADE SOCIAL DOS<br>CORREIOIS E TELEGRAFOS, ETB FUNDO DE<br>INVESTIMENTO E PARTICIPACOES (CVM ID<br>NO. 379-4), BNY MELLON SERVICOS<br>FINANCEIROS DISTRIBUIDORA DE TITULOS<br>E VALORES MOBILIARIOS S.A., THE BANK<br>OF NEW YORK MELLON and JOSÉ CARLOS<br>LOPES XAVIER DE OLIVEIRA a/k/a ZECA<br>OLIVEIRA,<br><br>        *Defendants.* | Adversary Pro. No. 17-01051(SCC)<br><br>**AMENDED ADVERSARY**<br>**COMPLAINT** |

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

INTRODUCTION ........................................................................................................1

    A.    Plaintiffs' Business. ..............................................................................2

    B.    Overview of Defendants' Scheme. ........................................................2

    C.    How Defendants' Stole Plaintiffs' Business. .........................................3

THE PARTIES ...........................................................................................................8

JURISDICTION AND VENUE ....................................................................................12

FACTUAL ALLEGATIONS .......................................................................................13

    I.    BACKGROUND TO DEFENDANTS' SCHEME: DEFENDANTS' FRAUD
          AGAINST PLAINTIFFS WAS PART OF A MASSIVE CRIMINAL FRAUD
          AND CORRUPTION SCHEME SINCE UNCOVERED BY BRAZILIAN
          AUTHORITIES ...............................................................................13

    II.    PLAINTIFFS BUILD A VALUABLE GLOBAL ELECTRONIC TRADING
          PLATFORM BUSINESS ...................................................................16

    III.    MPCM HIRES COHEN AND MACHADO TO SERVE AS EXECUTIVES FOR
          THE MARCO POLO LATIN AMERICAN BUSINESS AND TO RAISE
          MONEY FOR THE EXPANSION OF THAT BUSINESS ...................17

    IV.    DEFENDANTS' FRAUDULENT SCHEME TO USURP PLAINTIFFS' LATIN
          AMERICAN BUSINESS ...................................................................20

    V.    DEFENDANTS BUY PLAINTIFFS' 37.5% OF QUOTAS AT A DEPRESSED
          PRICE AND STEAL PLAINTIFFS' 21.5% OF QUOTAS ...................26

    VI.    PURSUANT TO BRAZILIAN LAW, THE COURT MAY PIERCE BNY
          BRAZIL'S CORPORATE VEIL, AND BNY US IS JOINTLY AND
          SEVERALLY LIABLE FOR ITS AND OLIVEIRA'S WRONGDOING ...........30

CLAIMS FOR RELIEF ...............................................................................................34

FIRST CLAIM FOR RELIEF ......................................................................................34

SECOND CLAIM FOR RELIEF ..................................................................................36

THIRD CLAIM FOR RELIEF .....................................................................................36

FOURTH CLAIM FOR RELIEF ..................................................................................38

**FIFTH CLAIM FOR RELIEF** ................................................................................**39**

**SIXTH CLAIM FOR RELIEF** .................................................................................**39**

**SEVENTH CLAIM FOR RELIEF**...........................................................................**40**

**EIGHTH CLAIM FOR RELIEF** .............................................................................**41**

**NINTH CLAIM FOR RELIEF** ...............................................................................**42**

**TENTH CLAIM FOR RELIEF** ..............................................................................**43**

**ELEVENTH CLAIM FOR RELIEF**........................................................................**43**

Plaintiffs, Debtor Marco Polo Capital Markets, LLC ("MPCM") and Marco Polo Network Inc. ("MPNI") (collectively "Plaintiffs"), by their undersigned counsel, as and for their Complaint against Defendants, state as follows:

## INTRODUCTION

1.     This case arises from Defendants' scheme to steal Plaintiffs' Latin American electronic-trading business; a business worth over $200 million. In this suit, Plaintiffs seek redress for Defendants' theft.

2.     Pretending to work for Plaintiffs to help them raise money for their business, Defendants Martin Fernando Cohen ("Cohen") and Arthur Pinheiro Machado ("Machado")— under the leadership of the Chairman and CEO of BNY Mellon Servicos Financeiros Distribuidora de Titulos e Valores Mobiliarios S.A. ("BNY Brazil"), José Carlos Lopes Xavier de Oliveira (a/k/a Zeca Oliveira) ("Oliveira") and with the help of other BNY Brazil executives—engineered and carried out a plot to steal Plaintiff's business from them.

3.     Specifically, Cohen and Machado, with Oliveira's guidance, convinced Plaintiffs to "park" almost a quarter of their interest in their business in a Cohen/Machado entity; but Cohen and Machado never returned this interest to Plaintiffs. And then, with Oliveira's help, Cohen and Machado took control of the business, drove it into the ground, and backed Plaintiffs into a corner so that their only option was to sell their remaining interest in the business at bargain-basement prices to Cohen and Machado. Cohen and Machado then sold this latter interest at a significant profit—rewarding Oliveira for his efforts even after, on information and belief, BNY Brazil fired him for corruption. Thus, through this scheme, Defendants were able to steal Plaintiffs' valuable business for next to nothing.

A.    **Plaintiffs' Business.**

4.    MPCM and MPNI together developed an innovative business that allowed clients to trade listed securities in over eighty exchanges around the world on a single integrated platform. The crown jewel of that business was MPCM's lucrative Latin American operations. MPCM hired Cohen and Machado as its executives to help expand those operations, entrusting them with the task of raising additional capital in Brazil and developing the key Brazilian market.

B.    **Overview of Defendants' Scheme.**

5.    Plaintiffs did not know that they had hired precisely the wrong individuals for the job, and that it would cost them everything. Machado and Cohen never intended to work in MPCM's best interests. Instead, as was their plan from the outset, and as explained in detail below, rather than acting as MPCM's fiduciaries, Cohen and Machado defrauded Plaintiffs as part of a broader fraudulent scheme created and masterminded by Oliveira and corrupt executives of Brazil's pension fund for postal employees, Defendant Postalis – Instituto de Seguridade Social Dos Correiois e Telegrafos ("Postalis").

6.    But this scheme was just one part of a larger, contemporaneous multi-billion-dollar fraud executed by Oliveira on behalf of BNY Brazil, as well as The Bank of New York Mellon ("BNY US"), together with executives at Postalis and similarly situated Brazilian state controlled and influenced entities. Unknown to MPCM, Postalis—which Oliveira, Cohen and Machado recruited to be an investor in Plaintiffs' business—was rife with corruption. And as recent criminal, civil, congressional and administrative investigations in Brazil have exposed, Postalis executives received hefty kickbacks and bribes in exchange for turning a blind eye to fraudulent activities by investment partners recommended by Oliveira, including Cohen and Machado. Nearly all Defendants (including BNY Brazil, Oliveira, Machado and Cohen) are the subjects of these

investigations, and several (including BNY Brazil and Oliveira) already have been indicted and/or found guilty of crimes or violations.

**C.** **How Defendants' Stole Plaintiffs' Business.**

7.       The first step in Defendants' fraud was to create the new Brazilian entity through which MPCM's Brazilian business would flow. This effort was directed by Oliveira and BNY Brazil. Rather than create a corporation or limited liability company that would be responsible for the Marco Polo Latin America business, as would be typical in such circumstances, Oliveira instead had Machado and Cohen form an upper entity layer in the form of an investment fund— ETB Fundo de Investimento e Participacoes with CVM (Brazilian SEC) Identification Number 379-4 (the "ETB Fund"). Cohen and Machado repeatedly and falsely represented to Plaintiffs that the ETB Fund structure was necessary—both because of Postalis' allegedly insisted on it (it did not, except as directed by Oliveira, Machado and Cohen), and under Brazilian regulations (no such regulations exist). Instead, the sole purpose of this structure was to create an opaque structure that would facilitate Defendants' fraudulent scheme.

8.       Acting in their capacity as executives of Marco Polo Latin America, and bound by their fiduciary obligations of utmost loyalty, Cohen and Machado selected all advisors—legal, valuation and consulting—needed to develop the transaction structure, and were the principal interface with the advisors in the discussions concerning structure and documents. Cohen and Machado ensured that the principals of MPCM had little direct interaction with the local legal and consulting advisors. All documents were planned and drafted in Portuguese and Cohen and Machado engineered significant delays in securing translations to ensure their complete control of the process.

9.       Next, without disclosing Postalis' corruption—or the role of Oliveira, Machado and Cohen therein—Cohen and Machado proposed to bring in Postalis as an investor in the ETB Fund.

3

The Postalis investment was necessary because Oliveira, Machado and Cohen used Postalis' corruption, and their relationships with Postalis' corrupt executives, to defraud Plaintiffs. In addition, under the terms of his employment agreement with MPCM, Cohen was entitled to a 3% finder's fee for procuring the investment.

10.     Cohen and Machado assured MPCM's institutional shareholders, including Goldman Sachs ("GS") and Religare Infotech Pty Ltd ("Religare"), that the structure of the transaction, including, specifically, the oversight of BNY Brazil, would safeguard MPCM's interests, in compliance with MPCM's Operating Agreement (the "LLC Agreement"). Indeed, Cohen and Machado were diligent in touting to MPCM's institutional shareholders the great benefits and significant opportunity for expansion the transaction would generate. Finally, Cohen and Machado introduced the Postalis management team directly to GS, at its offices at 200 West Street, New York, New York.

11.     Cohen and Machado again falsely represented to Plaintiffs that Brazilian regulations imposed a dual shareholder requirement in connection with the formation of the ETB Fund, and proposed to act as temporary stakeholders of the ETB Fund. For this role, they proposed using Victrix Partners S.A. ("Victrix"), a vehicle created to hold employee interests in the Fund. Cohen and Machado controlled Victrix and owned it together with other employees of the Latin American business (including other individuals now also under criminal investigation in Brazil). Pursuant to their scheme, Cohen and Machado structured the ETB Fund to be owned 50% by MPNI and 50% by Victrix. Cohen, Machado and Oliveira falsely assured Plaintiffs that this step was merely a technicality required by Brazilian regulations, and much of Victrix's stake would be returned to MPNI after a short lock-up period. This too was false. Cohen, Machado and Oliveira never intended to return this interest.

12.     Cohen and Machado further falsely represented that Victrix would surrender its shares to MPNI in two subsequent tranches, under a private purchase agreement with a nominal value. The first sale would be of approximately 28.66% of the shares, and the second would include the remaining 21.34%. Yet the second transfer never happened. The stake was never returned, and Cohen and Machado hold it to this day.

13.     Under the investment agreement with Postalis, Machado and Cohen represented that MPNI would retain 59% of the ETB Fund, 25% would go to Postalis, and the remaining 16% would be held by Victrix, as the employee shareholder program and quasi managing partner of this independent Latin America business, representing Cohen and Machado. As employees and fiduciaries of MPCM, Cohen and Machado pledged to carry out this plan loyally, in the best interests of shareholders and funds. Plaintiffs believed in them and agreed not to interfere in the management of the Latin America business and additionally not to compete with such business, fully collaborating with the expansion and development of the Marco Polo technology and activities in Latin America under the leadership of Machado and Cohen, as set forth in the executed Investment Agreement. Indeed, the Investment Agreement expressly provided Victrix and Postalis with a duty of loyalty to MPNI, which they also breached.

14.     Oliveira, Machado and Cohen performed none of their obligations to Plaintiffs, and never had any intention of doing so. Instead, they conspired with Postalis, and specifically its corrupt CEO, Alexa Predtechensky, and CFO, Ricardo Oliveira Azevedo, through the instruction and leadership of Oliveira, to completely subvert the transaction as planned. Their real goal was to steal away MPCM's entire Latin American business.

15.     From inception to the closing of the transactions described above, Cohen, Machado, BNY Brazil and Oliveira and the senior management of Postalis controlled and supervised the flow of information and documents, concealing their scheme from MPCM.

5

16.     Under the structure masterminded by Oliveira, Cohen and Machado, the Marco Polo Latin America business—Defendant ATG Americas Trading Group S.A., formerly known as Marco Polo Latin America S.A. (referred to herein as "MP Latin America" or "ATG")—would be held by the ETB Fund as its main asset. When the parties executed the Investment Agreement, the ETB Fund held 94.25% of MP Latin America. Thus, by gaining control of the ETB Fund, Defendants also gained control of MP Latin America.

17.     After the Postalis investment, Cohen and Machado were not only millionaires, but had the full support of Oliveira and corrupt Postalis CFO Ricardo Oliveira Azevedo, both of whom became members of the board of MP Latin America. Together with Cohen and Machado they had four of the seven seats on the board of directors of the company, and thus full control of the business. Defendants subsequently used their position to engineer a series of crises and threats to Plaintiffs' global business with the objective of manipulating Plaintiffs into a fire sale of their remaining 37.5% interest in the ETB Fund, nominally to Cohen and Machado, at a rock-bottom price.

18.     Defendants each benefitted from the scheme. Having done nothing to develop the trading business, Cohen and Machado ended up with the lion's share of the ETB stock (and, with it, control of MP Latin America), control of more than $65 million in investments, and the business vision, platform and intellectual property of Plaintiffs' groundbreaking business.

19.     After subsequent investments by Postalis into ETB, Machado and Cohen grew the ETB investment holdings to nominal values of many hundreds of millions of dollars. The embezzlement of the ETB platform from Plaintiffs was the foundation of a series of further embezzlements. After his departure from BNY Brazil, Oliveira joined Cohen and Machado with a senior executive position in the ETB fund and the new businesses and, upon information and belief

6

retains a substantial holding in the ETB fund to this day via indirect and shell structures. And Postalis executives are believed to have received substantial kickbacks from their co-conspirators.

20.      As evidence of their corrupt intent, on the eve of the closing of the Postalis investment, Machado and Oliveira had lunch to discuss the closing and how to deal with the liquidation of minority shareholders (which included undisclosed parties represented by Machado and Cohen, including leading parties in the Brazilian public sector and associates of Oliveira). After that meal, Machado e-mailed Cohen, with the topic stating that **"I had a great lunch with Zeca we are potentially billionaires."**

21.      Meanwhile, as Machado, Cohen and Oliveira schemed to become billionaires at Plaintiffs' expense, their fraudulent scheme left Plaintiffs with nothing but the meagre proceeds of the fire sale.  Moreover, the destruction of Plaintiffs' prized Latin American platform in this manner led to the deterioration of Plaintiffs' key shareholder relationships, capital raising capacity and consequently to the bankruptcy of its pioneering platform.

22.      As explained below, BNY Brazil and Oliveira were the masterminds of the scheme against Plaintiffs. Without the active leadership of Oliveira and BNY Brazil—from their expertise in creating the investment and corporate structures necessary to defraud Plaintiffs, to their prior relationships with Postalis' corrupt executives, and the power of the reputable name of The Bank of New York Mellon—Defendants' fraudulent scheme would never have been successful.

23.      Oliveira was not just the Chairman and CEO of BNY Brazil but, as expressly represented on BNY US's website and in numerous press releases, he was BNY US's "country executive" in Brazil. Furthermore, upon information and belief, Oliveira was supervised actively by BNY US employees from the United States. Thus, Oliveira acted not only on behalf of BNY Brazil, but also on behalf of BNY US. And even were Oliveira and BNY Brazil were not working under the express direction of BNY US (which they were), under Brazilian law—which applies

7

here pursuant to contract as well as New York choice of law principles—BNY Brazil's criminal wrongdoing means that its corporate veil may be pierced, and thus that BNY US may be held jointly and severally liable for BNY Brazil and Oliveira's wrongdoing.

## THE PARTIES

24.    Plaintiff-Debtor MPCM is a New York limited liability company that, at all relevant times, had its principal place of business in New York, New York. From its New York headquarters, MPCM owned and operated a dedicated global electronic platform for trading listed securities across the globe, focusing on trading flows to, from and between emerging markets. The platform linked the world's leading global financial institutions, including most of the Wall Street banks, to the national exchanges of 80 countries.

25.    Plaintiff MPNI is a Delaware corporation that, at all relevant times, had its principal place of business in New York, New York. MPNI is the majority (80%) shareholder of MPCM. MPNI was the original developer of the trading platform, which it transferred to MPCM in 2009. At all relevant times, MPNI acted in connection with the events set forth below both for itself as well as an agent of MPCM, so that both Plaintiffs have been damaged by Defendants' fraud and misconduct.

26.    ATG, formerly known as MP Latin America, is a Brazilian business entity with a principal place of business in Rio De Janeiro, Brazil. ATG has a permanent business office in Miami, Florida, from which it continuously and systematically engages in business and transactions in the United States, including in New York.

27.    Cohen is a citizen of Argentina who, upon information and belief, owns a home in Miami, Florida and is a resident of Florida. Upon information and belief, Cohen formerly was an executive of ATG, and is one of the largest shareholders/financial stakeholders of ATG, either directly or indirectly through Victrix, such that he has derived, and continues to derive, substantial

revenue, from ATG. Upon information and belief, Cohen regularly conducts business in Florida and other parts of the United States. At the time of the scheme against Plaintiffs occurred, Cohen was a paid employee of MPCM, and acting CEO of Marco Polo Latin America N.V. ("MPLA") before becoming CEO of the newly created Marco Polo Brasil. Cohen also was a member of the board of MPLA, receiving his salary through MPCM in New York until October 2010. Cohen regularly visited New York to meet Plaintiffs' officers and employees in New York, MPCM's investors (GS, New York Stock Exchange and Religare) and MPCM customers. In furtherance of his fraud and other misconduct alleged herein, Cohen also regularly communicated by phone and email with Plaintiffs' officers and employees based in New York.

28.    Machado is a citizen of Brazil who, upon information and belief, owns property in the United States. Upon information and belief, Machado was an executive of ATG and was one of its largest shareholders/financial stakeholders, either directly or indirectly through Victrix, such that he has derived substantial revenue from ATG. Upon information and belief, Machado also is currently an executive of more than 30 companies, including ATS Brasil S.A., which are controlled by ATG and continue to develop the original Marco Polo project in Brazil to this day. Upon information and belief, Machado regularly conducts business in Florida and other parts of the United States. At the time of the fraudulent scheme against Plaintiffs, Machado was a paid employee of MPCM, COO of Marco Polo Brasil and a member of the board of MPLA, receiving his salary through MPCM in New York. Machado's employment with MPCM was based in New York, and he regularly met with Plaintiffs' officers and employees and MPCM customers in New York. When he was outside of the United States, in furtherance of his fraud and other misconduct alleged herein, Machado regularly communicated by phone and email with Plaintiffs' officers and employees based in New York.

29.    Victrix is, upon information and belief, a Brazilian business entity with a principal place of business in Rio De Janeiro, Brazil that is (or was) substantially owned and controlled by Cohen and Machado. Cohen and/or Machado were the sole officers of Victrix, and Victrix acted through Cohen and/or Machado. Upon information and belief, other employees of the Latin American business and compatriots of Cohen and Machado, including Francisco Gurgel do Amaral Valente and Patricia Bittencourt de Almeida Iniarte—both of whom are now under criminal investigation in Brazil—were also involved with Victrix, working at Cohen and Machado's direction. As part of the scheme set forth herein, Victrix fraudulently induced Plaintiffs to transfer $1 million from its New York bank account so that Victrix could purchase shares in the ETB Fund, ostensibly on behalf of MPCM. Victrix also fraudulently induced Plaintiffs to permit it to hold 21.5% of the quotas (shares) of the ETB Fund, ostensibly for subsequent transfer back to Plaintiffs. In furtherance of the fraud and other misconduct committed by Victrix herein, Victrix—through Cohen and Machado—regularly visited New York to meet Plaintiffs' officers and employees in New York, and regularly communicated by phone and email with Plaintiffs' officers and employees based in New York. Victrix is an alter ego of Cohen and Machado and has been an instrument used by Cohen and Machado to further their fraud and misconduct.

30.    Postalis is a public pension fund of Brazilian postal workers with its principal place of business in Brasilia (DC) Brazil. In connection with the fraudulent scheme set forth herein, Postalis executives and representatives visited New York to meet with Plaintiffs' executives and MPCM's principal investor, GS. In addition, upon information and belief, Postalis executives attended meetings with one or more other defendants in Florida, in connection with Defendants' scheme to defraud Plaintiffs, as well the scheme of corrupt Postalis officers to defraud Brazilian postal workers of hard-earned pension funds.

31.     Since October 4, 2017, Postalis has been under investigation for non-compliance with rules related to the accounting of technical reserves and application of resources of Previc (the National Complementary Welfare Superintendence), mainly because of the frauds it or its executives committed with the help of BNY Brazil and Oliveira.

32.     The ETB Fund is a Brazilian investment fund with a principal place of business in Brazil. As set forth below, Plaintiffs had, and continue to have, an ownership interest in the ETB Fund.

33.     BNY Brazil is a Brazilian entity with its principal place of business in Brazil. Upon information and belief, BNY Brazil is a wholly owned subsidiary of BNY US, which provides asset management services in Brazil. BNY Brazil also acts as an administrator, manager and agent of certain investment funds in which Postalis is an investor, including the ETB Fund. As trustee and administrator of the ETB Fund, BNY Brazil acted as a fiduciary of the ETB Fund and its investors, including MPCM and MPNI. BNY Brazil's role included managing the ETB Fund, arranging for its quotas (shares) to be registered at, and transferred through, Brazil's CETIP clearing house, holding ETB Fund shares as custodian, and executing transfers of any ETB shares. Upon information and belief, as directed by Oliveira, BNY Brazil also was a knowing participant in the fraudulent scheme against Plaintiffs of Defendants Cohen, Machado, Victrix and Postalis. Postalis has filed several lawsuits against BNY Brazil, arising from BNY Brazil's contemporaneous misconduct as the manager of one or more Brazilian investment funds like the ETB Fund.

34.     BNY US is a New York state-chartered bank with a principal place of business in New York, New York. BNY US, through its branding, advertising, and communications to the outside world, holds out the BNY Brazil to be an integral and seamless part of the BNY global organization. Upon information and belief, defendant Oliveira, as the Chairman of BNY Brazil

11

and the top executive of BNY US in Brazil, reported directly to senior executives at BNY US in New York. BNY US executives in New York represented to MPCM and MPNI that they oversaw and monitored BNY US's operations in Brazil, including the actions of Oliveira, and upon information and belief, BNY US did engage in such oversight and monitoring.

35.     Oliveira is a citizen and resident of Brazil. Oliveira represented to Plaintiffs that he was the Chairman of BNY Brazil and the top executive of BNY US in Brazil. Plaintiffs agreed to the selection of BNY Brazil as the administrator of the ETB Fund in reliance upon the BNY US name, as well as the assurance that BNY US stood behind BNY Brazil as an institution.

36.     As the principal Bank of New York Mellon executive in Brazil, Oliveira acted on behalf of BNY US, BNY Brazil, and the ETB Fund. In a November 9, 2012, press release announcing BNY Mellon's receipt of a commercial banking license from the Brazilian Central Bank, Oliveira was referred to as "BNY Mellon's country executive in Brazil and CEO of the newly formed BNY Mellon Banco S.A." Upon information and belief, Oliveira reported to, and was overseen by, BNY US executives in New York. Upon information and belief, in December 2010 and January 2011, Oliveira travelled to Miami, Florida, where he met Postalis, Victrix, Machado and Cohen, to plan and carry out the fraudulent scheme set forth herein. Upon information and belief, Oliveira later was removed from his position after Postalis charged BNY US with misconduct by BNY Brazil in its manager/trustee role in connection with one or more funds like the ETB Fund. Oliveira then joined Cohen and Machado as an executive of ATG. Upon information and belief, today, Oliveira owns and manages a new hedge fund, Bridged Trust, which shares a building with ATG, in Rio de Janeiro.

## JURISDICTION AND VENUE

37.     On December 13, 2012, MPCM filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in this Court.

38.     MPCM's claims asserted herein are assets of MPCM's estate, and MPCM also has an interest in the claims asserted herein by MPNI.

39.     This is a core proceeding under 28 U.S.C. §§ 157 and 1334 and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

40.     This Court has jurisdiction over the parties and the subject matter of this proceeding under 28 U.S.C. §§ 157 and 1334 in that, among other things, it is a civil proceeding arising under Title 11 or arising in or related to a case under Title 11. This proceeding has been referred to this Court by the standing orders of reference applicable to this Court.

41.     Venue is proper in this District pursuant to 28 USC §§ 1408 and 1409.

## **FACTUAL ALLEGATIONS**

I.     **BACKGROUND TO DEFENDANTS' SCHEME: DEFENDANTS' FRAUD AGAINST PLAINTIFFS WAS PART OF A MASSIVE CRIMINAL FRAUD AND CORRUPTION SCHEME SINCE UNCOVERED BY BRAZILIAN AUTHORITIES**

42.     The scheme alleged below was part of a broader scheme of organized criminal corruption involving the highest levels of the Brazilian government, Brazilian government-controlled entities and Brazilian pension funds of government-run companies or for government employees, including defendant Postalis. Plaintiffs were just one set of victims of this broader criminal enterprise.

43.     Over the last several years, Brazilian authorities have launched several investigations, and secured indictments, concerning the practice by Postalis executives of using investment funds, like the ETB Fund, as money laundering vehicles—whereby pension monies were invested in a fund in exchange for kickbacks to Postalis executives, and possibly to Brazilian politicians. Payoffs also were made to other business leaders such as fund executives and fund managers (such as Cohen and Machado), who were enriched at the expense of other investors in the fund (like Plaintiffs) and the Brazilian postal workers.

13

44.     According to a September 2016 report in the Rio Times, "[t]he Federal Police in Brazil issued 147 warrants and ordered the seizure of assets of persons accused of mismanagement of funds in four of the country's largest pension funds: Funcef (Caixa Economica), Petros (Petrobras), Previ (Banco do Brasil) and Postalis (Brazilian Postal Service). The losses to these funds are said to be over R$8 billion [$2.5 billion]. . . . In all, 560 federal police officers were at hand in the states of São Paulo, Rio de Janeiro, Bahia, Espirito Santo, Rio Grande do Sul, Parana, Santa Catarina and Amazonas, and Brasilia to question at least 103 persons for what investigators believe are losses of billions of reais due to fraud and mismanagement of funds."

45.     Oliveira (as well as BNY Brazil), Machado and Cohen are at the center of these criminal investigations.

46.     Indeed, Oliveira was indicted as one of the leaders of this criminal organization. The Brazilian authorities obtained a court order to conduct searches and seizures, to access bank information, and to preventively arrest Oliveira—but he was abroad and avoided arrest.[1]

47.     BNY Brazil also is under investigation—and recently accepted a confidential plea bargain with Brazilian authorities[2]—as a company that received funds diverted from Postalis. The Brazilian Securities Commission (the Brazilian equivalent of the SEC) recently investigated BNY Brazil for offenses against the securities market while acting as administrator of investment funds

---

[1] Provisional Injunction Court Decision. Index n° 09/2017, Docket n° 37559-15.2017.4.01.3400. 10° Federal Court of Brasilia/DF.

[2] https://www.oantagonista.com/brasil/exclusivo-bny-mellon-negocia-leniencia-com-mpf-sobre-fundos-de-pensao/

for the benefit of Postalis,[3] and in 2019, found BNY Brazil guilty of obstruction and fined it R$ 5,075,597.01.[4]

48.    Further, in 2016, after conducting an extensive investigation, the Brazilian Federal Congress found that BNY Brazil admitted its representatives did not comply with BNY Brazil internal policies, codes and procedures.[5] This, among other things, also prompted the Brazilian federal public prosecutor to file a civil suit against BNY Brazil in February 2018, seeking reparation of the damage it caused to Postalis.

49.    Machado also was indicted as part of these investigations. He is accused of money laundering, currency evasion, corruption and fraud, and there is also evidence that he bribed Member of the Congress, public officers, and their emissaries in an attempt to protect himself from a 2015/2016 Congressional fraud investigation. Machado was arrested by Brazilian authorities following his indictment, but later was freed after filing a *habeas corpus* petition.[6]

50.    Cohen too is under investigation for his role as CEO of ATG, which succeeded MP Latin America, and which received large amounts of Postalis' irregular investments.

51.    Moreover, the CFO of Postalis, Ricardo Oliveira Azevedo, who Cohen and Machado selected to become a member of MP Latin America's board—after they fraudulently took control of the business— also is a subject of the criminal investigations into Postalis.

---

[3] CVM's Punitive Administrative Proceeding n° 02/2013 - Reg. Col. n° 0227/201. 01/22/2019 Report and Vote. ("Processo Administrativo Sancionador CVM").

[4] CVM's Punitive Administrative Proceeding n° 02/2013 - Reg. Col. n° 0227/201. 01/22/2019 Report and Vote. ("Processo Administrativo Sancionador CVM").

[5] Final Report of Congressional Investigation – Pension Funds ("Relatório Final CPI – Fundos de Pensão").

[6] https://g1.globo.com/rj/rio-de-janeiro/noticia/trf-2-retira-do-juiz-bretas-processo-do-empresario-arthur-pinheiro-machado.ghtml (July 4, 2018).

52.    Brazilian authorities further are investigating fraud charges specifically in connection with Postalis' investment in the ETB Fund and the MP Latin America business—including Postalis' failure to exercise its right of first refusal in connection with Plaintiffs' forced sale in May 2011 of 37.5% of the ETB Fund quotas to Cohen and Machado.

## II.    PLAINTIFFS BUILD A VALUABLE GLOBAL ELECTRONIC TRADING PLATFORM BUSINESS

53.    MPNI was launched in 2003 as the first electronic trading network with the objective of linking national stock exchanges around the world, enabling investors to access global markets more quickly, cheaply and transparently. A key selling point for MPNI was its pioneering focus on emerging markets trading flows.

54.    MPNI's "one connection" solution required developing and maintaining a complex combination of network management technologies, proprietary databases and industry-compliant order routing and order matching intelligence. From its hubs in New York, London and Singapore, MPNI built network links and interfaces to hundreds of local securities firms around the world, including in Latin America, allowing orders to flow seamlessly, without human touch, from the major industry trading screens (Reuters, Bloomberg, etc.), as well as the proprietary screens of global brokers.

55.    In 2006, the NYSE purchased an equity stake in MPNI, valuing the company at approximately US$50 million. In 2007, the World Bank purchased a stake in MPNI, valuing it at approximately US$70 million. Thereafter, in late 2007, Daiwa Securities purchased a stake in MPNI valuing it in a range of between US$150 – $350 million, based upon growth metrics.

56.    By 2008, MPNI had achieved the largest footprint for electronic trading in the global capital markets, reaching into over eighty countries including in the Latin American region. MPNI's products and services were adopted by almost all the world's largest banks, including major New York-based Wall Street firms, such as Morgan Stanley, Goldman, Sachs & Co., Bank

of America-Merrill Lynch, Citigroup, Societe Generale, BNP Paribas, Deutsche Bank, Credit Suisse, JP Morgan Chase, Barclays, Nomura, Jeffries, and a number of the premier institutional funds seeking greater access to global equity and debt markets.

57.     In 2009, MPNI restructured its business so that MPCM became the principal operating company for the global electronic trading platform business, including the subsidiary holding the Marco Polo Latin American business, and MPNI became a holding company with a controlling stake in MPCM. GS and Religare, a leading Indian financial institution, purchased equity stakes in MPCM.

58.     This structure was formed at the direct request of investors GS and Religare, both of which became shareholders of MPCM. Pursuant to the Operating Agreement, MPCM management (including Machado and Cohen) was required to, and did, involve both GS and Religare closely on investments such as the Postalis investment. GS and its lawyers were directly involved in the Postalis investment, meeting with Postalis executives post-close, and reviewing (and signing off on) the involvement of BNY Brazil.

## III.    MPCM HIRES COHEN AND MACHADO TO SERVE AS EXECUTIVES FOR THE MARCO POLO LATIN AMERICAN BUSINESS AND TO RAISE MONEY FOR THE EXPANSION OF THAT BUSINESS

59.     In the Fall 2009, MPCM wanted to expand its Latin America business.

60.     On December 18, 2009, MPCM hired Machado, among other things, to work with MPCM's CEO to execute a business plan designed to grow MPCM's Latin American business. Machado's role included reviewing the Brazil organization and business with MPCM's New York-based sales team, marketing the trading platform to clients in Brazil, and supporting MPCM's New York headquarters in raising capital for the expansion of the Latin American business.

61.    Under the parties' employment agreement, Machado's place of employment was MPCM's global headquarters in New York. Machado's employment was contingent upon his obtaining a visa permitting him to work in the United States.

62.    In connection with his employment, Machado also entered into a confidentiality agreement in which he agreed that his "employment creates a relationship of confidence and trust between me and the Company with respect to (a) all Proprietary Information [defined to include all information of commercial value, including trade secrets], and the confidential information of clients, suppliers or other third parties with which the Company has a relationship." Machado also agreed that "[a]t all times, both during the term of employment and after its termination for any reason, I will keep in strict confidence and trust all such Confidential Information, and will not use or disclose to any business, firm, entity or person any such Confidential Information without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company." The confidentiality agreement is governed by New York law.

63.    Machado introduced MPCM to Cohen. On Machado's recommendation, in April 2010, MPCM hired Cohen to be the CEO of MPLA, reporting directly to MPCM's CEO in New York. Cohen's duties included leading efforts to raise capital for the Latin American business.

64.    Cohen also entered into a confidentiality agreement in which he agreed that his "employment creates a relationship of confidence and trust between me and the Company [which included MPCM and affiliates] with respect to (a) all Proprietary Information [defined to include all information of commercial value, including trade secrets], and the confidential information of clients, suppliers or other third parties with which the Company has a relationship." Cohen also agreed that "[a]t all times, both during the term of employment and after its termination for any reason, I will keep in strict confidence and trust all such Confidential Information, and will not use

18

or disclose to any business, firm, entity or person any such Confidential Information without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company." Cohen's confidentiality agreement is governed by New York law.

65.    Ostensibly as part of his duty to raise capital for the Latin American business, Cohen purported to "identify" Postalis as a good investor candidate. In truth, this was part of Oliveira, Machado and Cohen's scheme to induce Plaintiffs to accept Postalis as an investor, so they together could steal Plaintiffs' business.

66.    In the mistaken belief that Postalis was acting as a legitimate investor, MPCM granted Cohen a "success fee" in the form of a promissory note (the "Cohen Promissory Note"). The Cohen Promissory Note states that it is governed by New York law and states that: "ANY ACTION OR PROCEEDING TO ENFORCE OR ARISING OUT OF THIS NOTE OR THE TRANSACTIONS RELATED THERETO, MAY BE COMMENCED IN ANY COURT OF COMPETENT JURISDICTION IN NEW YORK COUNTY, NEW YORK STATE." MPCM provided the Cohen Promissory Note in reliance upon Cohen's false and misleading representation that he had secured a legitimate investment from Postalis—when Cohen, in fact, had secured the Postalis investment as part of the fraudulent scheme. Cohen later used the fraudulently obtained Cohen Promissory Note to offset the purchase price of certain quotas (shares) he unlawfully acquired from Plaintiffs in May 2011, as set forth below.

67.    MPCM paid both Machado and Cohen through MPCM's New York payroll. Machado and Cohen owed fiduciary duties to Plaintiffs as executives and employees. Even after they also became direct employees of MP Latin America, Machado and Cohen continued to owe fiduciary duties to Plaintiffs as the majority shareholders of the ETB Fund, and of MP Latin America through the ETB Fund.

19

## IV.    DEFENDANTS' FRAUDULENT SCHEME TO USURP PLAINTIFFS' LATIN AMERICAN BUSINESS

68.    In mid-2010, after being entrusted with responsibility to grow Plaintiffs' Latin American business, and in furtherance of their corrupt scheme, Machado and Cohen represented to MPCM that they had procured Postalis as a potential investor.

69.    MPCM believed that Machado and Cohen had, after careful and investigation, selected Postalis as a good fit to invest. MPCM was unaware that the Postalis investment was not the work of Machado and Cohen alone, nor did MPCM know that it was not a mere coincidence that Machado and Cohen thought Postalis should invest—it was the central piece of their scheme.

70.    From the very beginning, Oliveira and BNY Brazil were intimately involved in the details of obtaining the Postalis investment. Upon information and belief, Oliveira had previous relationships at Postalis, including with its corrupt CFO, Ricardo Oliveira Azevedo, as Oliveira previously had worked with Azevedo and other corrupt Postalis employees to defraud other funds. MPCM was simply the next unsuspecting victim of Oliveira's broader scheme.

71.    The first step in the scheme was to falsely represent to Plaintiffs, and Plaintiffs' shareholders, that Postalis needed the financing to be carried out using a highly complex structure involving the formation of a new investment trust (what became the ETB Fund). Cohen and Machado further falsely represented to Plaintiffs that Brazilian regulations required this structure. This structure was created by Oliveira and BNY Brazil, which both created the structure of the ETB Fund as a Brazilian entity and drafted the documentation, including prospectuses and investment agreements, necessary for Postalis' investment in the ETB Fund, and supported Cohen and Machado throughout this process.

72.    The structure created by Oliveira and BNY Brazil also provided that BNY Brazil would be appointed as administrator of the ETB Fund, allowing Oliveira to further perpetrate his fraudulent scheme by obtaining a position of trust and confidence. Once BNY Brazil was

appointed as administrator of the ETB Fund, Oliveira, became the individual responsible as the fiduciary for the entity and its investors, including Plaintiffs. In that role, BNY Brazil and Oliveira were bound to administer the ETB Fund and its quotas (shares) fairly and equitably, and to disclose any impropriety relating to the issuance and transfer of the quotas under its custody and administration. Unfortunately, BNY Brazil failed to do so and, instead, under the direction of Oliveira, took advantage of this position of trust to perpetrate its scheme to defraud Plaintiffs.

73.     Cohen and Machado represented that the creation of ETB Fund and its structure was necessary under Brazilian regulation. But this was false. Instead, the real purpose was to create corporate layers that would render the transaction opaque to Plaintiffs, forcing them to rely entirely upon Cohen and Machado, as well as Oliveira and BNY Brazil, to faithfully protect Plaintiffs' interests.

74.     As early as May 2010, employees of BNY Brazil, at Oliveira's direction, prepared a first draft of an investment agreement for Postalis' investment in the ETB Funds. Upon information and belief, Oliveira reviewed this draft and forwarded it to Machado on May 21, 2010, who then forwarded the draft agreement to Cohen.

75.     Throughout June 2010, Cohen, Machado and Oliveira worked together to draft other documents relating to ETB Fund, including prospectuses and investment agreements, and provide these documents to Postalis to secure its investment in the ETB Fund. Upon information and belief, BNY Brazil employees including Carla Lopes (Head of the Structed Funds Department) and Oliveira drafted and/or reviewed every document concerning the ETB Fund, including those creating its structure and the documents necessary to obtain Postalis' investment in the ETB Fund.

76.     In furtherance of their scheme, on June 23, 2010, Cohen sent a prospectus for the ETB Fund that had been drafted by BNY Brazil and Oliveira to corrupt Postalis CFO Azevedo as

well as Adilson Florencio da Costa, another Postalis employee. Oliveira and Machado were copied on the e-mail.

77.    In furtherance of their corrupt scheme, on June 24, 2010, Machado, Cohen and Oliveira met with Postalis in Brasilia. Upon information and belief, the parties discussed their corrupt scheme during this meeting.

78.    Once BNY Brazil and Oliveira had finished drafting the documents for Postalis' investment, on June 30, 2010, Cohen sent the ETB Fund Investment Agreement to Azevedo and Adilson Florencio da Costa, as representatives of Postalis. Oliveira and Machado were copied on the e-mail.

79.    Throughout this period, Plaintiffs New York-based executives had virtually no contact with Postalis—and certainly no contact that was not coordinated by (and that included) Machado, Cohen and/or Oliveira. Cohen, Machado, BNY Brazil and Oliveira. The senior management of Postalis intentionally controlled and supervised the flow of information and documents, denying Plaintiffs direct access to Postalis. Plaintiffs thus relied on Machado, Cohen, BNY Brazil and Oliveira to represent their interests, as their fiduciary relationship required.

80.    Nearly all of Plaintiffs' meetings with Cohen and Machado post-close occurred at the GS building in New York, and calls between the parties were led by GS. The direct involvement of GS gave an air of legitimacy to the transaction. Indeed, GS and Religare instructed Plaintiffs to calculate their success fee based on the gross investment sum, even though ultimately Cohen and Machado would steal nearly all the investment funds.

81.    On July 2, 2010, (two months after Oliveira began working with Cohen and Machado on the ETB Fund structure and on the Postalis investment), Oliveira was introduced to MPCM executives by Machado and Cohen as an influential voice for Postalis and a key decisionmaker relating to the Postalis–Marco Polo investment. Plaintiffs now know that, as of July

2, 2010, Oliveira had already been intimately involved in trying to obtain Postalis' Marco Polo investment. At this time, Plaintiffs had no inkling of the monumental corruption that existed at Postalis.

82.    In furtherance of Defendants' corrupt scheme, Oliveira, as BNY US's top executive in Brazil, actively promoted the formation of the ETB Fund and the Postalis transaction. Specifically, Oliveira represented to Plaintiffs that BNY US was interested in developing a bundled execution and custodial solution with the Marco Polo platform that would further enhance the platform's growth and values.

83.    In furtherance of Defendants' corrupt scheme, on August 20, 2010, Machado asked Oliveira to have dinner with Vinode Ramgopal (founder of MPNI and former CEO of MPCM). Machado instructed Oliveira to tell Ramgopal that it was BNY Brazil's "honor and privilege" to provide services to the ETB Fund.

84.    On or around August 25, 2010, Oliveira, Machado, Cohen and Ramgopal had dinner in Rio de Janeiro. E-mails sent during this dinner show that several times during the dinner Machado and Cohen schemed to speak alone with Oliveira, without Ramgopal present. On information and belief, the purpose of these private conversations and this dinner was to carry out Defendants' fraudulent scheme. Throughout this dinner, Machado, Cohen and Oliveira all withheld the truth of their fraudulent scheme from Ramgopal.

85.    Cohen, Machado, Oliveira and BNY Brazil continued to execute their fraudulent scheme through the fall. Machado, Cohen and Oliveira met several times in September 2010, including on September 11, 2010, and September 21, 2010, in Brasilia, to discuss the investment agreement for Postalis to invest in the ETB Fund. Upon information and belief, during these meetings, the three discussed how to use the Postalis investment to perpetrate their fraudulent scheme. And upon information and belief, before or during these meetings, Machado specifically

requested Oliveira's support in helping to close the agreement. Upon information and belief, Cohen and Machado could not have closed the Postalis investment in the ETB Fund (and thus completed their fraudulent scheme) without the leadership of BNY Brazil and Oliveira.

86.     In furtherance of their corrupt scheme, on September 11, 2010, Cohen e-mailed Postalis CFO Azevedo at his personal e-mail address rather than his official Postalis address. Cohen told Azevedo that he had purchased him first class tickets and a room at a five-star hotel in New York. Upon information and belief, Cohen used Azevedo's personal e-mail address (or a separate one used solely to carry out his frauds) to avoid detection of the fraudulent scheme.

87.     In furtherance of their corrupt scheme, on October 1, 2010, Oliveira drafted an e-mail to Postalis CEO Alexa Predtechensky, which he sent to Machado. Machado forwarded the e-mail to Cohen, who then forwarded the e-mail to the personal e-mail address of Postalis CFO Azevedo, requesting his final approval of the closing steps "following their understanding." Upon information and belief, this "understanding" was that the Postalis investment would be used—as were prior Postalis investments—to allow Oliveira, Cohen and Machado to defraud the fund out of millions, while earning kickback's for Postalis' corrupt executives.

88.     Next, in furtherance of their corrupt scheme, on October 5, 2010, Machado and Oliveira had dinner to discuss the closing of the transaction and how to deal with the liquidation of minority shareholders. Upon information and belief, the liquidation of 'minority' shareholders (which included undisclosed parties represented by Machado and Cohen, including leading parties in the Brazilian public sector and associates of Oliveira) would be the way in which critical influential parties in the Brazilian public sector would be compensated and compromised for further benefit of Oliveira/Machado/Cohen, positioning them to secure much larger sums from the Brazilian pension industry.

89.     After Machado and Oliveira's meal on October 5 during which they discussed the liquidation of minority shareholders, Machado e-mailed Cohen, with the topic stating that "I had a great lunch with Zeca we are potentially Billionaires."

90.     The Postalis investment transaction closed in October 2010 and was documented, in part, in Portuguese by (a) an October 4, 2010 Investment Agreement among Postalis, MPNI and Victrix with the consent of the ETB Fund, MPCM, an MPCM subsidiary and MP Latin America; and (b) a September 16, 2010 Technology Transfer Agreement between MP Latin America, MPCM, an MPCM subsidiary and MPNI, on the one hand, and MP Latin America on the other hand, for the transfer of certain technology assets to MP Latin America.

91.     The record ownership of the quotas (stock) of the ETB Fund as reported to Plaintiffs after the closing, was roughly 25% by Postalis, 37.5% or 1,103,000 quotas by MPNI, and 37.5% by Victrix (16% for the anticipated ESOP and 21.5% or 563,640 quotas being held for future transfer to Plaintiffs). Plaintiffs contributed their Latin American business and Postalis contributed money (some of which, upon information and belief, was covertly diverted from or through the ETB Fund to Defendants, Postalis executives or others as part of the fraud) to the ETB Fund in exchange for their respective interests in the ETB Fund. Victrix contributed nothing in exchange for its interest.

92.     Upon information and belief, in December and January 2011, Oliveira, acting in his capacity as head of BNY Brazil, met with Machado, Cohen, Victrix and Postalis in Miami, Florida. Oliveira's personal attendance at these meetings was not necessary to carry out BNY Brazil's responsibilities as administrator. Rather, on information and belief, the meeting occurred so Defendants could continue to discuss the details of how to defraud Plaintiffs.

## V.     DEFENDANTS BUY PLAINTIFFS' 37.5% OF QUOTAS AT A DEPRESSED PRICE AND STEAL PLAINTIFFS' REMAINING 21.5% OF QUOTAS

93.     After the Postalis transaction closed, Defendants controlled the Latin America business by holding a majority of the ETB Fund board seats (two seats each for Postalis and Victrix, as opposed to only three for Plaintiffs). They also controlled MP Latin America's operations, and information relating to those operations, through Cohen's and Machado's continued role as executives of both the ETB Fund and MP Latin America. Furthermore, Postalis initially appointed Oliveira as one of its two ETB Fund board designees.

94.     Defendants used their *de facto* control to shut Plaintiffs out of the Latin American business, so Plaintiffs could not oversee or have input into the business or evaluate the performance of the business.

95.     Defendants also used confidential information that Cohen and Machado possessed about Plaintiffs' business to the detriment of Plaintiffs, in breach of Cohen and Machado's confidentiality agreements. With the benefit of that confidential information, Defendants also engaged in various tactics to distract, disrupt and undermine Plaintiffs operationally and financially. The purpose of these tactics was to squeeze the business to push Plaintiffs to sell their 37.5% of the ETB Fund quotas at cut rate prices.

96.     Defendants' tactics included, among other things: false and baseless threats of litigation, refusal to pay for inter-company order routing services that MPCM provided at considerable cost (which Cohen and Machado knew would undercut MPCM financially because they had been privy to MPCM's confidential business and financial plans), and making disparaging and conflicting statements to MPCM's regional brokers and clients, thereby undermining those relationships and harming MPCM's business.

97.     Defendants also interfered with Plaintiffs' efforts to raise additional capital for MPCM, even though Cohen and Machado knew based on their access to MPCM's confidential

business and financial plans that such capital was badly needed. Defendants' conduct included approaching targeted investors to suggest they invest directly in MP Latin America, instead of MPCM, and telling prospective investors that they planned to sue MPCM to scare such investors away from investing in MPCM.

98.    Upon information and belief, Machado, Cohen, Postalis and Oliveira met in Miami, Florida in December 2010 and in January 2011 to plan the next steps in their fraudulent scheme, including their plan to purchase Plaintiffs 37.5% of quotas of the ETB Fund at a bargain-basement price. Defendants secretly agreed that Postalis would not exercise its rights of first refusal for any sale of the quotas, to drive down the price that Plaintiffs would receive. Later, Cohen and Machado would sell back some of these quotas to Postalis at a vastly higher price, allowing Cohen and Machado to expand their holdings without cost to them. This plan was not in Postalis' financial interest (or that of the postal workers Postalis was supposed to serve), but greatly benefitted the corrupt Postalis executives, Cohen, Machado and Oliveira.

99.    Machado and Cohen then pursued the purchase of Plaintiffs' 37.5% stake in the ETB Fund, falsely and misleadingly representing to Plaintiffs' executives that Postalis had decided not to exercise its right of first refusal. Postalis executives refused to respond to direct overtures from MPCM. Plaintiffs consequently relied on that representation in proceeding with the sale transaction at liquidation prices.

100.    Under an agreement dated May 14, 2011, MPNI agreed to sell, and subsequently sold, 1,013,000 in quotas (the 37.5% then held in MPNI's name) to Cohen and Machado for a severely depressed nominal price of about US$15 million. The actual price was even less than that (about US$7 million) because Cohen and Machado demanded deductions from the purchase price based on bogus obligations, including Cohen's fraudulently obtained "success fee" reflected in the Cohen Promissory Note.

101.    Based on the value of the ETB Fund at the time when Postalis made its October 2010 investment, the 37.5% stake was worth at least US$90 million—and potentially significantly more with the execution of the Marco Polo business plan that was to be funded by the Postalis proceeds, had those proceeds flowed to the business as intended.

102.    As planned, Postalis did not invoke its right of first refusal in connection with the May 2011 sale of quotas by MPNI. However, on information and belief, only a few months later, Postalis purchased 7.5% of the quotas of the ETB Fund for R105 million or US$53 million, as opposed to the $3 million it could have paid for the same quotas had it exercised it ROFR rights. Previc, the Brazilian government agency that oversees Brazilian funds, is investigating Postalis' misconduct relating to its investment in the ETB Fund and MP Latin America, including its failure to exercise its right of first refusal.

103.    The May 2011 sale by MPNI of the 37.5% of quotas (shares) did not include the sale of the 21.5% of quotas that Plaintiffs believe are still parked in name of Victrix for future transfer to Plaintiffs, and Plaintiffs maintain their right to receive that 21.5% of quotas. Victrix paid nothing for the 21.5% of the quotas, and it has no right to retain them.

104.    BNY Brazil and Oliveira also assisted in this phase of the scheme. BNY Brazil and Oliveira knew that the planned transaction with Postalis was supposed to conclude with Plaintiffs owning 59% of the quotas of the ETB Fund. And, as the administrator and custodian of the ETB Fund quotas with responsibility for effectuating transfers and recording of quotas, BNY Brazil and Oliveira were supposed to make sure that happened. But they did not. Instead, they aided Cohen and Machado in their fraudulent scheme and in breaching their fiduciary duties to Plaintiffs, permitting Cohen and Machado to retain (through Victrix) the 21.5% of the ETB Fund quotas that were supposed to be transferred to Plaintiffs, and to purchase the 37.5% of quotas for a depressed price.

28

105.    In addition, on information and belief, BNY Brazil and Oliveira deliberately failed to disclose to Plaintiffs their knowledge concerning the fraudulent scheme, including the information that came to their attention about the scheme during Oliveira's meetings in Miami with the other defendants in December 2010 and January 2011.

106.    After May 2011, Defendants continued their fraudulent scheme by concealing their misconduct (the facts of which are uniquely within their knowledge), thus preventing Plaintiffs from understanding what happened, and from acting to remedy the wrongs done. For example, in 2015, a high-powered Brazilian lawyer representing Machado, Cohen. Oliveira and Victrix flew to New York to meet with Vinode Ramgopal (founder of MPNI and former CEO of MPCM). At the meeting, the Brazilian lawyer warned Mr. Ramgopal that his reputation, and his family's reputation, would be maligned if he did not cease making inquiries to the Brazilian pension authorities concerning the transactions between Plaintiffs and Postalis and the other defendants. Mr. Ramgopal was informed that Oliveira was especially angry about his efforts and that Oliveira had commissioned the New York meeting. Following Mr. Ramgopal's continued work to ascertain the truth, defamatory reports were published in the *New York Post* to damage Mr. Ramgopal's reputation and more particularly that of his wife, a then Head of School Board.

107.    In December 28, 2015, MPCM's bankruptcy counsel sent a letter to Cohen, Machado and Victrix demanding that they take steps to return the 21.5% of quotas (563,640 of quotas) to Defendants. Cohen, Machado and Victrix did not respond to the letter and, to date, have not refused to transfer the 21.5% of quotas in the ETB Fund in accordance with their earlier agreement to do so.

108.    Through their fraudulent scheme Defendants ended up acquiring 59% of Defendants' Latin American business for about US$7 million when such holdings were worth more than US$150 million.

29

109.   After learning that millions of dollars had mysteriously been deducted from the investment funds paid by Postalis, senior executives of Plaintiffs brought this to the attention of Plaintiffs' Board of Directors—which demanded an explanation from Machado and Cohen concerning the identity of the recipients and the reason for the payment. But Machado and Cohen refused to identify the recipients, any explanation concerning the payments, or invoices documenting services or other reasons for payments. GS's lawyers also made similar requests, which Machado and Cohen similarly refused. Thereafter, citing "reputational risks," GS sold its interest in Plaintiffs.

110.   Defendants' fraud and misconduct caused substantial damages to Plaintiffs and effectively destroyed their pioneering global trading platform and their business. The amount of such damages is to be determined at trial.

## VI.   PURSUANT TO BRAZILIAN LAW, THE COURT MAY PIERCE BNY BRAZIL'S CORPORATE VEIL, AND BNY US IS JOINTLY AND SEVERALLY LIABLE FOR ITS AND OLIVEIRA'S WRONGDOING

111.   It is well-established that the laws of the forum state determine the jurisdiction which supplies the substantive law governing a veil piercing claim. Pursuant to New York choice-of-law principles, the law of the state of incorporation of the entity whose veil is to be pierced governs whether the corporate form will be disregarded to impose liability on that entity's owners, parents or shareholders.[7] BNY Brazil was a Brazilian corporation, so Brazilian law governs whether the Court may pierce its corporate veil.

112.   Pursuant to the Brazilian Civil Code, as interpreted by Courts in Brazil, Brazilian courts will pierce the corporate veil of a corporation, allowing creditors to seek relief against the

---

[7] *See Fletcher v. Atex, Inc*., 68 F.3d 1451 (2d Cir. 1995); *In re Saba Enterprises, Inc*.,4 21 B.R. 626, 648 – 650 (Bankr. S.D.N.Y. 2009).

corporation's owner(s), when there has been corporate or business fraud, violations of the rules that govern Brazilian companies, civil wrongdoing under the Brazilian Civil Code, and "infringement of the Brazilian economic order," or other criminal conduct.

113.    Under Brazilian law, violations of the following criminal statutes may serve as a basis for piercing the corporate veil:

- Violations of the Securities Market Act (Law 6.385/76).

- Violations of the Act on crimes against the National Financial System (Law 7.492/86).

- Violations of the Consumer Defense Code (Law 8.078/90).

- Act on tax evasion and crimes against the economic order (Law 8.137/90).

- Violations of the Anti-Money Laundering Act (Law 9.613/98).

114.    Upon information and belief, BNY Brazil and/or Oliveira are being investigated for and/or have been indicted for violations of one or more of the foregoing statutes (*see* paragraphs 42 - 52). And as the criminal, civil, congressional and administrative investigations and indictments have shown, BNY Brazil and Oliveira were guilty of criminal conduct in their dealings with Postalis, which included their fraud against Plaintiffs.

115.    Specifically, upon information and belief, BNY Brazil and Oliveira are being investigated for, and/or may have committed, one or more of the following criminal offenses (*see id.*):

- Swindling (estelionato) (Article 171, Penal Code): the act of obtaining an undue advantage by deceiving someone to support damage, through any fraudulent means.

- Commerce frauds (Article 175, Penal Code; Law 8.078/90; Law 8.137/90)

- Frauds committed by the board of directors of a corporation (Sociedade Anônimas – as set forth in Article 177, Penal Code)

- Misappropriation (apropriação indébita) (as set forth in Article 168, Penal Code): the act of misappropriating someone's asset that is under the agent's possession.

- Misappropriation of public funds (peculato) (as set forth in Article 312, Penal Code)

- Extortion (as set forth in Article 158, Penal Code)

- Falsifications and false statements (as set forth in Articles 289 to 311, Penal Code)

- Tax evasion (as set forth in Articles 168-A and 334, Penal Code)

- Money laundering (Law 9.613/98)

- Fraud in public bids (Law 8.666/93)

- Misappropriation of funds, deceit, parallel accountancy, false statement, in the context of financial institutions (Law 7.492/86)

- Crimes against patents and brands, and crime of unfair competition (Law 9.279/96)

- Anti-trust violations (Law 8.137/90)

116.     Moreover, violations of the regulations issued by certain Brazilian governmental authorities may serve as a basis for piercing the corporate veil, including:

- Brazilian Securities Commission ("CVM")

- Brazilian Central Bank (BACEN)

- General Federal Control Office ("CGU")

- Federal Income Tax Office ("SRF")

- Superintendence of Private Insurance ("SUSEP").

117.     Upon information and belief, BNY Brazil and/or Oliveira are being investigated for and/or have been found guilty of violating regulations promulgated by one or more of the foregoing

agencies (*see* Paragraph 48). This includes investigations into BNY Brazil for offenses against the securities market while acting as the administrator of investment funds for the benefit of Postalis, as well as against Postalis' CEO.

118.    Upon information and belief, BNY US knew of, but turned a blind eye to, the rampant corruption of its Brazilian subsidiary. Despite this, BNY US continued to hold BNY Brazil out as part of BNY US. Absent the Bank of New York Mellon name, BNY Brazil could not have carried out its frauds, including its fraudulent scheme against Plaintiffs.

119.    Moreover, the entire reason that BNY Brazil and Oliveira got away with their outrageous conduct was because they benefited from their connection to BNY US. Plaintiffs put their faith and trust in BNY Brazil and Oliveira because of their belief and trust in the solid, global reputation of BNY US.

120.    BNY US actively encouraged Plaintiffs to repose their trust in BNY Brazil and Oliveira. As a general matter, BNY US represents to the outside world (including to Plaintiffs) that BNY Brazil is an integral, seamless part of BNY US. On BNY US website, its Brazil operations are represented to be fully integrated operations of BNY US itself. There is no indication that any separate entity is involved in Brazil. For example, BNY US website contains a webpage for Brazil stating under "our story" that it operates in Latin America as "one BNY US." The Brazil webpage also lists the head of BNY Brazil as being "Chairman of Latin America for BNY US and Country Executive for Brazil" and that he oversees "client coverage for BNY across Latin America." The same webpage displays BNY US's (not BNY Brazil's) global assets under administration and management.

121.    In a November 9, 2012, press release issued by BNY Mellon (BNY US) announcing that BNY Mellon had received a commercial banking license by the Brazilian Central Bank,

referred to Oliveira as "BNY Mellon's country executive in Brazil and CEO of the newly formed BNY Mellon Banco S.A."[8]

122.    The effect of BNY US's communications to the public is to convey the clear impression that its Brazilian operations are under its direct control, thus assuring potential clients that even in Brazil they can put their trust in BNY US's worldwide reputation. Those representations had their intended effect on Plaintiffs, convincing them to go ahead with the proposed transactions, secure in the belief that BNY US stood behind the bona fides of the deal.

123.    Accordingly, both because BNY US publicly conveys that BNY Brazil is under its direct control, and because of BNY Brazil's criminal wrongdoing, BNY Brazil's corporate veil may be pierced, and BNY US is jointly and severally liable for BNY Brazil's wrongdoing here.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Fraud Against Defendants ATG, Cohen, Machado, Victrix, Postalis, ETB Fund, BNY Brazil, BNY US, and Oliveira)**

124.    Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

125.    Defendants and/or their agents knowingly engaged in a premeditated scheme to deceive and defraud Plaintiffs, and Defendants knowingly misrepresented, omitted or concealed material facts, and otherwise engaged in acts to deceive Plaintiffs as set forth above, including misrepresenting the purpose of their actions and concealing their fraudulent scheme, with the intent to defraud Plaintiffs.

126.    Each Defendant named in this claim engaged in this misconduct or knew the other Defendants were engaged in it on their behalf.

---

[8] https://www.prnewswire.com/news-releases/bny-mellon-awarded-banking-license-in-brazil-178074261.html

127.    Plaintiffs reasonably and justifiably relied on those material misrepresentations and omissions in proceeding with the transactions described herein, including but not limited to, (a) employing Cohen and Machado as executives and trusted agents and sharing with them confidential and proprietary business and financial information; (b) proceeding with the fall 2010 investment transaction with Postalis, including entering into, among other things, the October 4, 2010, Investment Agreement and the September 16, 2010, Technology Transfer Agreement; (c) entering into the Cohen Promissory Note; (d) entering into the agreement to park 21.5% of the ETB Fund quotas (563,640 quotas) with Victrix, Cohen and Machado and permitting such quotas to be held by Victrix; and (e) entering into the May 14, 2011, MPNI agreement to sell 1,013,000 of quotas or approximately 37.5% of its quotas in the ETB Fund to Cohen and Machado (the "May 14, 2011 Quotas Sale Agreement"), and thereafter causing the transfer of those quotas to Cohen and Machado. These transactions, actions, representations, and omissions were all part of a unified scheme to defraud Plaintiffs through a series of continuing wrongs, leading to the May 14, 2011 Quota Sales Agreement and subsequent related sale, and then continuing with the fraudulent Postalis purchase of 7.5% of quotas in the second half of 2011 and the subsequent efforts to conceal the fraud and threaten Plaintiffs' former CEO, as a result of which Plaintiffs were bilked out of their valuable interests in MP Latin America and the ETB Fund.

128.    Defendants' fraud directly and proximately caused substantial damages to Plaintiffs.

129.    Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of those acts, Plaintiffs are entitled to, and should be awarded, punitive damages against Defendants.

130.    Plaintiffs may have no adequate remedy at law such that the Court should grant equitable relief.

131.   WHEREFORE, Plaintiffs pray for judgment as set forth below.

## SECOND CLAIM FOR RELIEF
### (Aiding and Abetting Fraud Against All Defendants)

132.   Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

133.   Each Defendant had knowledge of the fraud alleged herein.

134.   Each Defendant, either themselves or through their agents, provided substantial assistance in the commission of the fraud in that, among other things they, took steps to further the fraud, concealed the fraud or failed to act when required to do so or otherwise enabled the fraud to proceed and succeed, and their actions and assistance directly and proximately caused substantial damages to Plaintiffs.

135.   Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of those acts, Plaintiffs are entitled to, and should be awarded, punitive damages against Defendants.

136.   Plaintiffs may have no adequate remedy at law such that the Court should grant equitable relief.

137.   WHEREFORE, Plaintiffs pray for judgment as set forth below.

## THIRD CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Against Defendants Cohen, Machado, Victrix, Postalis, BNY Brazil, BNY US, and Oliveira)

138.   Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

139.   Defendants by themselves, and through their agents, and in their collaboration with the other Defendants who acted as agents of each other, owed fiduciary duties to Plaintiffs by their de facto control of MP Latin America and the ETB Fund and their superior access to information.

140.   Defendants Machado and Cohen owed fiduciary duties to Plaintiffs as executives and employees, and even after they ceased to receive a salary directly from Plaintiffs, they continued to owe fiduciary duties to Plaintiffs because, among other reasons, they never resigned

as employees and were still part of the Marco Polo team, they were also executives and/or board members of MP Latin America and the ETB Fund and exercised de facto control over MP Latin America and the ETB Fund, when MPNI (and MPCM as a beneficiary of MPNI) were majority shareholders of the ETB Fund and of MP Latin America through the ETB Fund.

141.    Defendant Postalis owed fiduciary duties to Plaintiffs because Postalis was a major shareholder of the ETB Fund and of MP Latin America through the ETB Fund, Postalis served, through its of its agents, on the board of directors of MP Latin America and the ETB Fund, and Postalis exercised de facto control over MP Latin America and the ETB Fund, when MPNI (and MPCM as a beneficiary of MPNI) were majority shareholders of the ETB Fund and of MP Latin America through the ETB Fund.

142.    Defendant Oliveira owed fiduciary duties to Plaintiffs as majority shareholders of the ETB Fund and of MP Latin America through the ETB Fund based on his role as the agent of the BNY Brazil and BNY US and his service as a member of the board of directors of MP Latin America and the ETB Fund.

143.    Defendant BNY Brazil owed fiduciary duties to Plaintiffs as majority shareholders of the ETB Fund and of MP Latin America through the ETB Fund based on the BNY Brazil's role as trustee and administrator and BNY US's agreement to oversee and supervise the BNY Brazil in this capacity.

144.    Moreover, Section 2.1 of the Investment Agreement between Postalis, MPNI and Victrix provided that the parties owed each other a duty of loyalty, which Postalis and Victrix violated as to MPNI.

145.    Defendants Cohen, Machado, Victrix, Postalis, BNY Brazil, and Oliveira further breached their fiduciary duties to Plaintiffs as investment promoters by promoting the fraudulent

transactions, and by encouraging and inducing Plaintiffs to invest in the ETB Fund, and then participate in the subsequent fraudulent transactions.

146.    Defendants' breached their fiduciary duties by engaging in the fraudulent misconduct described above. These transactions, actions, representations, and omissions were all part of a unified scheme to defraud Plaintiffs through a series of continuing wrongs, leading to in the May 14, 2011 Quota Sales Agreement and subsequent related sale, and then continuing with the fraudulent Postalis purchase of 7.5% of quotas in the second half of 2011 and the subsequent efforts to conceal the fraud and threaten Plaintiffs' former CEO, as a result of which Plaintiffs were bilked out of their valuable interests in MP Latin America and the ETB Fund.

147.    Defendants' breaches of fiduciary duty directly and proximately caused substantial damages to Plaintiffs.

148.    Plaintiffs may have no adequate remedy at law such that the Court should grant equitable relief.

149.    WHEREFORE, Plaintiffs pray for judgment as set forth below.

## FOURTH CLAIM FOR RELIEF
### (Aiding and Abetting Breaches of Fiduciary Duty Against All Defendants)

150.    Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

151.    Defendants breached their fiduciary duties to Plaintiffs as set forth above.

152.    Each Defendant aided and abetted, or participated in, the breaches of fiduciary duty of each other Defendant, and substantially assisted such breaches.

153.    Defendants' aiding and abetting, and participating in, the breaches of fiduciary duty of each other Defendant directly and proximately caused substantial damages to Plaintiffs.

154.    BNY US specifically held itself out as responsible for the actions of the BNY Brazil and Oliveira, and Plaintiffs specifically relied on those representations in placing their trust in the BNY Brazil and Oliveira

155.    Plaintiffs may have no adequate remedy at law such that the Court should grant equitable relief.

156.    WHEREFORE, Plaintiffs pray for judgment as set forth below.

**FIFTH CLAIM FOR RELIEF**
**(Fraud in the Inducement Against Defendants Cohen, Machado and Victrix)**

157.    Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

158.    Cohen, Machado and Victrix knowingly engaged in a premeditated scheme to deceive and defraud Plaintiffs, and knowingly misrepresented, omitted or concealed material facts, and otherwise engaged in acts to deceive Plaintiffs as set forth above, including misrepresenting the purpose of their actions and concealing their fraudulent scheme, with the intent to inducing Plaintiffs into, among other things, (a) entering into the October 4, 2010 Investment Agreement and the September 16, 2010 Technology Transfer Agreement; (b) entering into the agreement to park 21.5% of the ETB Fund quotas (563,640 quotas) with Victrix and permitting such quotas to be held by Victrix; and (c) entering into the May 14, 2011 Quotas Sale Agreement to sell 1,013,000 of quotas or approximately 37.5% of its quotas in the ETB Fund to Cohen and Machado, including its dispute resolution provisions.

159.    Plaintiffs, because of the fraudulent inducement by Cohen, Machado, and Victrix, entered into the agreements described above, which thereby caused direct and proximate damages to Plaintiffs.

160.    Plaintiffs may have no adequate remedy at law such that the Court should grant equitable relief.

161.    WHEREFORE, Plaintiffs pray for judgment as set forth below.

**SIXTH CLAIM FOR RELIEF**
**(Conversion of the 21.5% of Quotas in the ETB Fund against Defendants Cohen, Machado and Victrix)**

162.    Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

39

163.    MPNI and/or MPCM have a possessory right or interest in the 21.5% of the quotas (or 563,640 quotas) in the ETB Fund that is still believed to be held by Victrix, Cohen or Machado.

164.    Plaintiffs' quotas in the ETB Fund constitute property for the purposes of a claim for conversion.[9]

165.    Defendants Cohen, Machado and Victrix have exercised dominion and control over that property or have acted in derogation of Plaintiffs' rights, and as such have interfered with Plaintiffs' rights to that property.

166.    By reason of the foregoing, Defendants Cohen, Machado and Victrix have caused damages to Plaintiffs.

167.    Defendants Cohen, Machado and Victrix have engaged in the malicious and willful commission of wrongful acts relating, for example, to willingly, knowingly and wrongfully converting of 21.5% of the quotas (or 563,640 quotas) in the ETB Fund belonging to Plaintiffs and, because of the reprehensible and outrageous nature of those acts, Plaintiffs are entitled to, and should be awarded, punitive damages against those Defendants.

168.    Plaintiffs may have no adequate remedy at law such that the Court should grant equitable relief.

169.    WHEREFORE, Plaintiffs pray for judgment as set forth below.

## SEVENTH CLAIM FOR RELIEF
### (Aiding and Abetting Conversion of the 21.5% of Quotas in the ETB Fund against All Defendants)

170.    Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

---

[9] *See In re CIL Ltd.*, 582 B.R. 46, 114 (Bankr. S.D.N.Y. 2018) (collecting cases holding that interest in an entity may constitute property for conversion purposes).

171.    MPNI and/or MPCM have a possessory right or interest in Plaintiffs of the 21.5%

of the quotas (or 563,640 quotas) in the ETB Fund that is still believed to be held by Victrix, Cohen

or Machado.

172.    Defendants Cohen, Machado and Victrix have exercised dominion and control over

that property or have acted in derogation of Plaintiffs' rights.

173.    Each of the Co-Defendants knew of the wrongful conduct of conversion by

Defendants Cohen, Machado and Victrix and aided and abetted and substantially assisted in that

conversion, and Cohen, Machado and Victrix each aided and abetted and substantially assisted

each other in that conversion and such conduct directly and proximately caused substantial

damages to Plaintiffs.

174.    Defendants have engaged in the malicious and willful commission of wrongful acts

relating to said conversion such that Plaintiffs are entitled to, and should be awarded, punitive

damages against those Defendants.

175.    Plaintiffs may have no adequate remedy at law such that the Court should grant

equitable relief.

176.    WHEREFORE, Plaintiffs pray for judgment as set forth below.

### EIGHTH CLAIM FOR RELIEF
#### (Civil Conspiracy Against All Defendants)

177.    Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

178.    As set forth above, Defendants have committed torts against Plaintiffs, including:

(a) a scheme to defraud that, upon information and belief, included bribery and kickbacks and

other criminal misconduct, (b) breaches of fiduciary duty by the Defendants named in Third Claim

for Relief, and (c) the conversion of the ETB Fund quotas by Cohen, Machado and Victrix.

179.    Defendants Cohen, Machado, Victrix, Postalis, and Oliveira and the BNY Brazil

and BNY US (through their agent, Oliveira) agreed to participate in a common scheme against

41

Plaintiffs. Defendants intentionally participated in the furtherance of a plan or purpose to obtain property from Plaintiffs, damage Plaintiffs and enrich themselves at the expense of Plaintiffs. In furtherance of this plan or purpose, Defendants committed overt and unlawful acts, including acts alleged herein.

180.    Defendants' conspiracy, and the overt acts committed in furtherance of that conspiracy, and the torts committed against Plaintiffs, has directly and proximately caused damages to Plaintiffs.

181.    Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of those acts, Plaintiffs are entitled to, and should be awarded, punitive damages against Defendants.

182.    Plaintiffs may have no adequate remedy at law such that the Court should grant equitable relief.

183.    WHEREFORE, Plaintiffs pray for judgment as set forth below.

**NINTH CLAIM FOR RELIEF**
**(Turnover or Recovery of 21.5% Quotas in the ETB Fund and of the 37.5% of the Quotas in the ETB Fund under Bankruptcy Code Section 542, and MPCM'S and MPNI's Claims for Turnover or Recovery of Such Quotas Under Other Applicable Law or In Equity by MPCM Against All Defendants)**

184.    Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

185.    The 21.5% of the quotas (or 563,640 quotas) in the ETB Fund described above is in the possession, custody or control of another entity.

186.    The 37.5% of the quotas (or 1,013,000 quotas) in the ETB Fund described above is in the possession, custody or control of another entity.

187.    That property could be used or sold in accordance with the provisions of Section 363 of the Bankruptcy Code for the benefit of the Debtor MPCM's estate, and the property has more than inconsequential value to the Debtor MPCM's estate.

188.     Therefore, Defendants should be ordered to turnover of the 21.5% of the quotas (or 563,640 quotas) and the 37.5% of the quotas (or 1,013,000 quotas) in the ETB Fund under Section 542 of the Bankruptcy Code or, in the alternative, Defendants should be ordered to turnover and/or transfer to Plaintiffs the 21.5% of the quotas (or 563,640 quotas) in the ETB Fund or the 37.5% of the quotas (or 1,013,000 quotas) in the ETB Fund under other applicable law or in equity, and/or the Court should issue a declaratory judgment that Plaintiffs are the owners of those quotas.

189.     WHEREFORE, Plaintiffs pray for judgment as set forth below.

### TENTH CLAIM FOR RELIEF
### (Unjust Enrichment Against All Defendants)

190.     Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

191.     Defendants, by their fraud and other wrongful acts, were enriched at Plaintiffs' expense, and accordingly it is against equity and good conscience to permit Defendants to retain any such enrichment or to retain any enrichment obtained from their misconduct.

192.     Plaintiffs may have no adequate remedy at law such that the Court should grant equitable relief.

193.     WHEREFORE, Plaintiffs pray for judgment as set forth below.

### ELEVENTH CLAIM FOR RELIEF
### (Breach of Contract Against Defendants Cohen, Machado and Victrix for Breach of Their Confidentiality Agreement)

194.     Plaintiffs repeat and re-allege all preceding paragraphs as if fully set forth herein.

195.     In connection with their employment, Defendants Cohen and Machado each agreed with MPCM that their "employment creates a relationship of confidence and trust between me and the Company with respect to (a) all Proprietary Information [defined to include all information of commercial value, including trade secrets], and the confidential information of clients, suppliers or other third parties with which the Company has a relationship."

196.     Both Defendants Cohen and Machado also agreed that "[a]t all times, both during the term of employment and after its termination for any reason, I will keep in strict confidence and trust all such Confidential Information, and will not use or disclose to any business, firm, entity or person any such Confidential Information without the written consent of the Company, except as may be necessary in the ordinary course of performing my duties as an employee of the Company."

197.     MPNI is an intended third-party beneficiary of those agreements.

198.     Upon information and belief, Defendants Cohen and Machado have continuously and repeatedly breached those contractual obligations by using, and disclosing to third parties, MPCM's Confidential Information to serve their own interests and the interests of the other Defendants.

199.     The breach of contract Defendants Cohen and Machado has caused damages to Plaintiffs.

200.     WHEREFORE, Plaintiffs pray for judgment as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request and demand relief and judgment in their favor as follows:

A.     An order requiring the transfer to Plaintiffs of the 21.5% of the quotas (or 563,640 quotas) in the ETB Fund, and the execution and delivery of such documentation, and recordation in the books of the ETB Fund, as may be necessary to reflect such transfer and to reflect the ownership of such quotas by MPNI and/or MPCM, and/or a declaration that MPNI and/or MPCM is the owner of such quotas;

B.     Rescission of the September 16, 2010 Technology Transfer Agreement, the Cohen Promissory Note, and the May 14, 2011 Quotas Sale Agreement;

44

C.     An order requiring the transfer to Plaintiffs of the 37.5% of the quotas (or 1,013,000 quotas) in the ETB Fund and the execution and delivery of such documentation, and recordation in the books of the ETB Fund, as may be necessary to reflect such transfer and to reflect the ownership of such quotas by MPNI and/or MPCM, and/or a declaration that MPNI and/or MPCM is the owner of such quotas;

D.     An order imposing a constructive trust for the benefit of Plaintiffs on (a) all assets, including technology, transferred by Plaintiffs to, and held by or under the control of, Defendant ATG and/or Defendant ETB Fund or any other Defendant, and all revenues generated on account of the use of such assets or technology since the inception of the ETB Fund, (b) the 21.5% of the quotas (or 563,640 quotas) in the ETB Fund held by or under the control of any Defendant, and all profits, dividends or distributions related to, or payable on account of, such quotas, and any proceeds from any sale of such quotas, since the inception of the ETB Fund, and (c) the 37.5% of the quotas (or 1,013,000 quotas) in the ETB Fund held by or under the control of any Defendant, and all profits, dividends or distributions related to, or payable on account of, such quotas, and any proceeds from any sale of such quotas, since the inception of the ETB Fund;

E.     An order of an accounting with respect to (a) the finances and assets of Defendant ETB Fund and Defendant ATG (MP Latin America), (b) the use of all monies invested in Defendant ETB Fund, including all monies to be invested by Defendant Postalis, whether invested in the ETB Fund or diverted to others, and (c) such other subject matters as the Court deems just and proper;

F.     An order requiring disgorgement by Defendants Cohen and Machado of all compensation and other benefits received by them from Plaintiffs in an amount to be determined at trial;

G.    An order requiring disgorgement by Defendants of all profit, monies, assets, things of value or gains derived from their illegal conduct;

H.    Compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial;

I.    Punitive damages against Defendants, jointly and severally, in an amount to be determined at trial;

J.    Pre-judgment and post-judgment interest to the fullest extent permitted at law or in equity on all amounts of damages or other monetary amounts awarded;

K.    Costs and disbursements of this proceeding, including attorneys' fees; and

L.    Such other and further relief in law, equity or otherwise as this Court may deem just and proper.

Dated: New York New York
      June 27, 2019

**SCHLAM STONE & DOLAN LLP**

By:   /s/ Jeffrey M. Eilender
    Jeffrey M. Eilender
    John M. Lundin
    Joshua Wurtzel
    26 Broadway, 19th Floor
    New York, NY 10004
    Phone: (212) 344-5400
    Email: jeilender@schalmstone.com
    Email: jlundin@schalmstone.com
    Email: jwurtzel@schlamstone.com
    Email: sallen@schlamstone.com

*Attorneys for Plaintiffs Marco Polo Capital Markets LLC, Debtor, and Marco Polo Network Inc.*